UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil No. 09-08 (RHK/FLN) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Keith E. Anderson, | |
| Respondent. | |

Ana H. Voss, Assistant United States Attorney, for Petitioner.
Katherine Menendez, Assistant Federal Defender, for Respondent.

**THIS MATTER** came before the undersigned United States Magistrate Judge on March 4, 2009, and again on April 10, 2009, on the Government's Petition to Determine Present Mental Condition of an Imprisoned Person under 18 U.S.C. § 4245 [#1] at the Federal Medical Center in Rochester, Minnesota. The petition alleges that Keith E. Anderson presently suffers from a mental disease or defect for the treatment of which he is in need of custody and care in a suitable psychiatric facility, namely the Federal Medical Center in Rochester. Respondent is a 67 year-old male currently serving a 20 year sentence imposed by the United States District Court, Western District of Washington, for Conspiracy to Defraud the United States Government, Aiding and Assisting in the Preparation of Fraudulent Income Tax Returns, Conspiracy to Commit Wire Fraud and Mail Fraud, Mail Fraud, Conspiracy to Commit Money Laundering, and International Money Laundering. His projected release date is May 6, 2020. At the March 4 hearing, Federal Medical Center staff psychologist Andrew Simcox testified. Mr. Anderson refused to attend the hearing. The

Government submitted four exhibits into evidence.[1]  The Defendant submitted one exhibit into evidence.[2]  Respondent, Mr. Anderson, did attend the hearing on April 10, 2009.  At the April 10, 2009, hearing, Dr. Simcox testified again, as did Dr. Shine and the respondent, Mr. Anderson.  For the reasons which follow, this Court recommends the Government's Petition [#1] be **GRANTED**.

## I.    FINDINGS OF FACT

### A.    March 4, 2009 Hearing.

On March 4, 2009, the Court held a hearing on the Government's Petition.  Mr. Anderson was not present for the hearing.  Counsel for the government and defense counsel both represented to the Court that staff at the FMC-Rochester had tried without success to persuade respondent to attend.  Mr. Anderson's counsel represented to the Court that Mr. Anderson rebuffed her attempts to meet with him and that Mr. Anderson would unlikely be persuaded to attend the hearing even if the Court were to visit Mr. Anderson in his cell and, again, inform him of his right to attend the hearing.  Being satisfied that every effort had been made to secure Mr. Anderson's participation, the Court convened the hearing and decided not to compel his attendance by force.

Psychologist Dr. Andrew Simcox testified at the hearing.  The parties stipulated to his qualification as an expert.  Dr. Simcox rendered an opinion that Mr. Anderson is currently suffering from a psychotic illness not otherwise specified ("NOS").  He testified that Mr. Anderson's

---

[1]  Gov't Ex. 1:   Medical Records, Central File, Vols. 1-4, submitted in 4 file folders.
Gov't Ex. 2:   Mental Health Evaluation for Keith E. Anderson, October 9, 2008, FMC Rochester.
Gov't Ex. 3:   Inmate Discipline Data Chronological Disciplinary Record for Keith E. Anderson.
Gov't Ex. 4:   FMC Rochester Incident Report for 8-20-08, Being in an unauthorized area.

[2]  Def. Ex. A:   Criminal Docket for Case #02-423, Western District of Washington.

condition has been difficult to diagnose because Mr. Anderson has repeatedly refused medical evaluation. He stated that he does not have enough information to rule out a medical cause for Mr. Anderson's behavior because he has refused to be evaluated. In forming his opinion, Dr. Simcox reviewed Mr. Anderson's medical file (*see* Gov't Ex. 1) and literature about anti-government groups. Dr. Simcox also met with Respondent a number of times. When Mr. Anderson first arrived in January 2008, Dr. Simcox met with him on a daily basis for a couple of weeks. Subsequently, he met with him once per month. In the last couple of months, however, Dr. Simcox stated that he had meet with Mr. Anderson at least eight times. Dr. Simcox testified that he has not been Mr. Anderson's treatment provider; the primary clinician has been Dr. Hart.

Beginning in April 2007, Mr. Anderson was incarcerated by the Bureau of Prisons ("BOP") at the Federal Correctional Institution ("FCI") in Terminal Island, California. (Gov't Ex. 2 at 60.) Dr. Simcox testified that at the Terminal Island facility, Mr. Anderson engaged in passive resistance to the institution's rules. Specifically, he refused to stand for routine counts of prisoners, a protocol used to ensure the security of the facility. He also refused to respond when his name was called and refused to accept meals. Because he did not follow the rules, Mr. Anderson remained in the Special Housing Unit (the "SHU") the entire time he was at the prison. Mr. Anderson's disciplinary violations were recorded on his record, but he was eventually found to be "not responsible" for them after an evaluation by prison psychologists and the warden. (*See* Gov't Ex. 3.)

In the first half of December 2007, staff at Terminal Island noted that Mr. Anderson's behavior changed notably. (*Id.* at 61.) Staff recorded that he refused to take showers, was not speaking logically and was observed talking to himself and laughing and "picking at things in the air." He also requested his immediate release from the facility. (*Id.*) Prior to his transfer to the

White Memorial Hospital on December 20, 2007, he had refused 11 of 13 previous meals, refused water, appeared increasingly agitated and restless, and was placed on suicide watch as a precaution even though he had not expressed a desire to kill himself (*Id.* at 62.) When he arrived at the hospital, he was given Haldol, an antipsychotic medication, and Ativan, a drug that controls anxiety. (*Id.*) He was not however given any additional medication during his subsequent 24-day stay. (*Id.*) On January 14, 2008, Mr. Anderson was sent back to Terminal Island. (*Id.*) Staff noted that he appeared more lucid upon his return and ate more consistently but he remained "anxious, with restricted range of affect, and he continued to report eccentric and odd beliefs." (*Id.*) Because his behavior remained troubling to the staff, Mr. Anderson was transferred to FMC-Rochester on January 18, 2008, for diagnosis and observation of psychiatric symptoms.

Prior to July 2007, Mr. Anderson weighed 170 pounds and upon his arrival at FMC Rochester on January 18, 2008, he weighed 137 pounds. (Gov't Ex. 2 at 61-62.)

At FMC-Rochester, Mr. Anderson was initially placed in the Martin Wing of the Mental Health Unit ("MHU"), a semi-locked housing unit where patients are allowed out of their rooms but are restricted to the wing. (*Id.* at 62.) On February 20, 2008, he was transferred to the open housing in the MHU. (*Id.* at 63.) One week later, however, he was sent to the SHU for refusing to stand for the count. (*Id.*) Dr. Simcox testified that in March 2008, Mr. Anderson was emergently medicated (involuntarily) after he had declined food, fluids and medical treatment. While on the anti-psychotic medication, Mr. Anderson began eating and his level of paranoia diminished. Dr. Simcox testified that, during this time, Mr. Anderson continued to perceive himself as a hostage of the federal government.

After Mr. Anderson's emergent medication in March 2008, the government filed a 18 U.S.C.

§ 4245 petition with the Court but subsequently withdrew it. Dr. Simcox testified that after the petition was withdrawn, Mr. Anderson continued to be evaluated. Dr. Simcox also testified that, at this time, he began researching the beliefs of "tax protesters."

At the hearing, Dr. Simcox testified that the petition was withdrawn because after consulting with counsel for the Respondent and the attorney for the Government, it was concluded that the petition had only alleged conduct consistent with what both lawyers referred to as "tax protesters." The IRS defines a tax protester as "a person who protests taxes on constitutional grounds, which courts have held are without merit." *England v. Commissioner*, 798 F.2d 350, 352 (9th Cir. 1986).

On March 19, 2008, Mr. Anderson was released from the SHU to the Martin Wing, but was again returned to the SHU on April 17 because he refused to stand for the count. (*Id.* at 64.) On June 2, 2008, he was transferred to the open unit and remained there without incident until August 20, 2008 when Mr. Anderson attempted to leave the prison. (Gov't Ex. 4.) Dr. Simcox testified that Mr. Anderson packed his belongings, approached a sally port door and demanded his release. An incident report was filed on this occasion but Anderson was found not competent to understand disciplinary proceedings and not responsible for his conduct at the time of the incident. (Gov't Ex. 2 at 64.) After this incident Mr. Anderson was placed in the SHU. He was however transferred to the Martin Wing on September 12, 2008 where he has "not been a management problem for correctional or clinical staff." (*Id.* at 65.)

Dr. Simcox testified that Mr. Anderson would benefit from treatment at FMC-Rochester. He stated that available treatments include activity therapy, talk therapy and medication to reduce paranoia. Dr. Simcox testified that Mr. Anderson does not perceive himself as mentally ill. He believes he is a hostage who was abducted by the federal government. During his stay at FMC-

5

Rochester, Mr. Anderson wrote multiple inmate request forms with "similar themes" which were interpreted by clinic staff as delusional. In these forms, Mr. Anderson stated that he is citizen of Iowa but not a member of "the federal corporate entity." (*Id.* at 63.) He wrote that he is not KEITH E. ANDERSON 63025-004 but rather Keith Eldon Anderson; that he does not have liability for the KEITH E. ANDERSON 20 year prison sentence. (*Id.*)

Dr. Simcox also testified that Mr. Anderson has refused to accept food and services from the prison because to do so, he would contract to be a slave to the United States government. He did however testify that Mr. Anderson has developed a system whereby he accepts food in exchange for a coupon given to prison staff.

Dr. Simcox testified that the last time Mr. Anderson had refused food and liquids was in March of 2008. He testified that Mr. Anderson is able to dress himself and attends to his hygiene. He testified that Mr. Anderson has never been assaultive or threatening and has never expressed suicidal thoughts. His current weight is around 170 pounds.

Dr. Simcox testified that at some time during Mr. Anderson's stay at FMC-Rochester, Mr. Anderson acquiesced to dental care when he was experiencing unbearable dental pain.

Dr. Simcox testified that currently, Mr. Anderson is more lucid than he was at the time Dr. Simcox drafted his report in October 2008, but his lucidity is not expected to continue and Mr. Anderson will likely require emergency medication again, as his symptoms have tended to wax and wane over the course of his time in prison. He continues to be paranoid that if he participates in life at the prison, he will lose his status as a free man.

Dr. Simcox testified that Mr. Anderson's need to receive care and treatment is not only necessary but also beneficial. Dr. Simcox testified that Mr. Anderson would not function well in

6

a mainstream institution. Dr. Simcox testified that treatment was necessary because Mr. Anderson will, at some point, resume refusing food and medical care and he is at risk of being harmed by security guards if he attempts to leave prison, as he has attempted to do so in the past.

### B.     April 10, 2009 Hearing.

The Court held another hearing on April 10, 2009, after receiving the Government's March 26, 2009, letter indicating that Mr. Anderson had been emergently medicated after refusing to eat. Upon receipt of this letter, the Court ordered that another hearing must be held, at which the Government was required to present testimony on the facts and circumstances that lead to the emergency medication. Dr. Andrew Simcox, Dr. Daniel Shine and Mr. Anderson testified at the hearing.

#### 1.     Testimony of Dr. Simcox.

Dr. Simcox testified that on March 24, 2009, Dr. Hart made the decision to move Mr. Anderson from the Martin Wing to the seclusion wing because Mr. Anderson's bed in the Martin Wing was needed for another patient. Dr. Hart initially offered to transfer Mr. Anderson to the open unit but Anderson refused. (Gov't Ex. 5 at 1674.) Dr. Simcox described Mr. Anderson as being passively noncompliant during the process of his move. When Mr. Anderson was moved to the seclusion wing, he was required to take a shower. After doing so, he refused to put on handcuffs so that he could be escorted to his room. He also stopped eating and taking fluids. Dr. Simcox testified that FMC-Rochester staff repeatedly tried to convince Mr. Anderson to eat and drink but he refused. By March 26, Mr. Anderson had refused five meals in a row and the decision was made to emergently medicate him. (Gov't Ex. 5 at 1706.) On March 26, 2009, Mr. Anderson was given fast acting and slow acting Haldol, an antipsychotic drug, Ativan, and Cogentin, a drug that counters

the side-effects of Haldol. (*Id.*) He was also given nutrition and fluids through an IV. A blood test was also taken at the time and it revealed that Mr. Anderson had increased levels of potassium and early dehydration. (*Id.*) After the administration of the medications, Mr. Anderson continued to refuse food and fluids and refused to communicate with staff members. (*Id.*) Mr Anderson involuntarily received the same type and dosage of medication on March 27, 30, 31 and April 1, 2009. (*Id.*) On April 1, Mr. Anderson began voluntarily eating meals but refused to voluntarily accept psychiatric treatment. (*Id.*) Even while on the medication, he continued to believe he was falsely imprisoned and that he was not the person FMC-Rochester staff believed he was. (*Id.*)

On April 6, 2009, Mr. Anderson was transferred from SHU to the Martin Wing. (*Id.*) The results of further blood tests indicated that he was no longer dehydrated and his potassium levels were within the normal range. (*Id.*)

Dr. Simcox met with Mr. Anderson the morning and night before the hearing and on another occasion, approximately one week prior to the hearing. When asked about why he had not been eating recently, Mr. Anderson told Dr. Simcox that he had been fasting for spiritual reasons. Mr. Anderson told Dr. Simcox that he had however been drinking water out of the sink in his cell and Dr. Simcox admitted that it was possible Anderson could have been doing so. Mr. Anderson also told Dr. Simcox that he was upset about the name tag on his door in the SHU. In the Martin Wing, Mr. Anderson had been able to make his own name tag for his door, but was not allowed to do so in the SHU.

Dr. Simcox testified that he believes Mr. Anderson's beliefs go beyond unorthodox political views to delusions. Dr. Simcox testified that Mr. Anderson made frequent references to his secret coded identity and referred to a decoding manual filed under seal somewhere that would reveal his

true identity. He testified that Mr. Anderson's identity issues were continually changing in that he was comfortable for a period of time being addressed in a certain way but would soon demand to be addressed in a different way. Dr. Simcox also testified that Mr. Anderson exhibited instability in his presentation. He stated that Mr. Anderson had pressured speech and was unable to assimilate new information and, as a result, when faced with change, would have extreme anxiety and would engage in extreme behaviors like refusing to eat for days at a time. Dr. Simcox testified that Mr. Anderson had responded really well to treatment in that when he has been on medication, he accepts food and communicates appropriately.

Dr. Simcox characterized the most recent series of emergency medications as part of a pattern. Dr. Simcox testified that when Mr. Anderson becomes stressed, he becomes more rigid and engages in extreme behavior that puts himself at risk. He testified that Mr. Anderson becomes so paranoid he refuses to accept services, food and liquids.

In the Addendum to Mr. Anderson's Mental Health Evaluation (Gov't Ex. 6 at 1704-1707.), it was noted that Mr. Anderson was emergently medicated in October of 2008 after he repeatedly demanded to be escorted off the property. (*Id.* at 1705.)

    **2.    Testimony of Dr. Shine.**

Dr. Daniel J. Shine is a staff psychiatrist at FMC-Rochester. The parties stipulated that he is a qualified expert. (*See* Gov't Ex. 7.) Dr. Shine testified that he had not been involved in treating Mr. Anderson until recently. Dr. Shine consulted with Mr. Anderson's treating physician, Dr. Hart, on the decision to emergently medicate him on March 26, 2009. Dr. Hart had proposed emergency medication for Mr. Anderson because of his poor food intake and his unwillingness to communicate with staff.

Dr. Shine testified that Mr. Anderson "backed Dr. Hart into a corner" after refusing to accept her offer to send Mr. Anderson to the open unit when his bed in the Martin Wing was needed for another patient. Dr. Hart's only other option was to send Mr. Anderson to the special housing unit ("SHU"). When Mr. Anderson was sent to SHU, he became mute and immobile. He lay in his bed, covered his head with a blanket and refused to communicate with staff members. Dr. Shine described Mr. Anderson's behavior as catatonic.

Dr. Shine was also concerned that Mr. Anderson may be on a hunger strike. He stated that under Bureau of Prisons policy, an investigation into a hunger strike must be conducted after an inmate misses nine meals. Officials are not however required to wait until nine meals have been missed in order to investigate. He testified that the clinicians did not wait that long in this case because Mr. Anderson had a history of not eating, he was an older man, and staff members could not verify whether or not he had been consuming fluids.

Dr. Shine testified that Mr. Anderson was given short and long forms of haldol because they had been effective in the past in treating Mr. Anderson. He testified that the longer-acting form of Haldol takes about one week to affect a patient's behavior and the shorter-acting Haldol takes 24 hours before it benefits the patient. Dr. Shine testified that Mr. Anderson responded to the medication the very next day in that he went from being passive to argumentative about his treatment. Mr. Anderson did however continue to refuse food the first day after receiving medication.

Dr. Shine testified that a blood sample was also taken of Mr. Anderson on March 26. (Gov't Ex. 9.) The lab tests on it indicated: (1) his BUN was elevated for an older person although it was in the general range of normal; (2) his creatine levels were within the range of normal, but, as an

older person, indicated he was approaching dehydration; (3) his potassium level was high; (4) his hemoglobin and hematocrit levels were high. These test results showed evidence of a metabolic disturbance resulting from dehydration. Dr. Shine testified that blood tests taken a few days later after Mr. Anderson had been administered fluids and nutrition indicated that the worrisome levels of various things returned to normal. Dr. Shine testified that Mr. Anderson began voluntarily eating again on April 2 and did not give any explanation as to why. Dr. Shine testified that Mr. Anderson voluntarily submitted to a blood test on April 6 and his levels were normal, indicating that the emergency administration of fluid and nutrition was successful in warding off dehydration. Dr. Shine testified that Mr. Anderson returned to the Martin Wing on April 6 and has been eating regularly since that time.

According to Dr. Shine, Mr. Anderson is suffering from a mental disease or defect for which he needs custody for care or treatment. He testified that Mr. Anderson suffers from a psychotic disorder not otherwise specified. He testified that Mr. Anderson's beliefs about his identity are delusional because Mr. Anderson believes that someone else should be serving time for the crimes for which he was found guilty. He testified that Mr. Anderson has required emergency medication three times in one year - in March of 2008, October of 2008 and March of 2009. He testified that Mr. Anderson needs to be in a place where emergency treatment is available; that such treatment is not merely beneficial, but potentially life-saving. He testified that Mr. Anderson refuses food and engages in other extreme behaviors when he experiences changes he cannot control.

Dr. Shine testified that the medications were effective on Mr. Anderson. Their effectiveness was evidenced by his willingness to come to the hearing after he adamantly refused to attend the first hearing.

### 3. Testimony of Mr. Anderson.

Mr. Anderson testified that he is not the Keith Eldon Anderson whom the Government charged with crimes. He testified that his "true" identity may be learned by referencing a "decoding manual" filed as docket entry 966 in his criminal case, 02-CR-0423, from the Western District of Washington.

Mr. Anderson testified that life on the Martin Wing at the FMC-Rochester is comfortable for him. He stated that he likes living there the best of the places where he has been incarcerated. Mr. Anderson likes the Martin Wing because he is allowed to put his own name tag on the door and he is not required to give any identification in order to get food. Mr. Anderson testified that the only times he refuses food is when the food is improperly labeled. Mr. Anderson explained he was reluctant to eat food labeled with his name because he was trying to avoid "playing the part of a prisoner." He described the federal justice system as a play with actors and parts and he refused to play the part of the prisoner. Mr. Anderson stated that the Martin Wing gave him the most latitude to be himself and, there, he does not feel that he is being forced to take on the identity of someone else.

Mr. Anderson testified that Dr. Hart never gave him the option of going to the open wing the end of March 2009. Mr. Anderson testified that Dr. Hart told him she did not want him in the open unit; he was told he had no choice but to go to the special housing unit ("SHU"). Mr. Anderson testified that he was upset about being transferred to SHU because he was writing a book and would be unable to continue doing so in the SHU. Mr. Anderson stated that when he was transferred to SHU he refused to speak with staff and to accept meals because he was exercising his right to remain silent and he was fasting. He stated that he was not fasting in protest but rather for

religious reasons. He testified that in the future, he plans to eat regularly and fast from time to time. He stated that he does not want to take anti-psychotic medications because he does not like the side-effects, namely insomnia.

He testified that his political beliefs have not changed since he was incarcerated. He stated that he has had the same beliefs since he was living in Costa Rica before he was charged with any crimes. He testified that he was not present for sentencing in his criminal trial in the Western District of Washington.

Mr. Anderson testified that on April 6 he was transferred back to the Martin Wing and agreed to be hand-cuffed during the transfer, as was required by institution rules.

## II.     LEGAL ANALYSIS

Pursuant to 18 U.S.C. § 4245, a federal prisoner may not be transferred to a mental hospital or treatment facility, without the prisoner's consent or a court order. *See United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990) vacated in part on reh'g on other grounds by *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects to being transferred, then the court must hold a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); *United States v. Jones*, 811 F.2d 444, 447 (8th Cir.1987). If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General. 18 U.S.C. § 4245(d). Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. *Watson*, 893 F. 2d at 972.

If the court determines that the inmate is suffering from a mental disease and is in need of treatment, the Attorney General must then hospitalize the prisoner "for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." 18 U.S.C. § 4245(d).

In sum, there are three issues therefore before this Court: whether Mr. Anderson is suffering from a mental disease or defect; whether he is in need of custody for care or treatment of that disease or defect; and whether FMC-Rochester is a suitable facility.

### A.  Mental Disease or Defect.

Prior to the April 10, 2009 hearing, the Court was not convinced that Mr. Anderson was suffering from a mental disease or defect because at the first hearing, Dr. Simcox was unable to testify with specificity how Mr. Anderson's beliefs differed from those of any other protester. However, after hearing the April 10, 2009 testimony of Mr. Anderson, Dr. Simcox and Dr. Shine, the Court concludes that Mr. Anderson is suffering from a mental disease or defect.

At the hearing, Mr. Anderson testified that the Court could discern his "true" identity by referencing a sealed "decoding manual" filed as docket entry 966 in his criminal case in the Western District of Washington. The Court obtained a copy of documents filed in the docket entry. One document is a letter from the Government to the Honorable John C. Coughenour, the judge who presided over Mr. Anderson's criminal trial. The letter stated that, upon the judge's order, the Government had redacted from transcripts the names of taxpayers who had purchased "tax evasion programs" from Mr. Anderson's company. The letter also stated the Government had filed under seal a "key" identifying each taxpayer whose name was redacted in the transcripts. The "key" is simply a list of taxpayer names and does not refer to Mr. Anderson in any manner.

In his April 10, 2009, testimony, Dr. Simcox stated that he believed Mr. Anderson's beliefs about his identity go beyond unorthodox political views and are delusions. He stated that Mr. Anderson had made frequent references to his coded identity. Dr. Simcox also testified that Mr. Anderson's identity issues changed over time and that Anderson was comfortable being addressed in a certain way for a period of time, but thereafter would inexplicably demand to be called a different name. Dr. Simcox also testified that Mr. Anderson was unable to assimilate new information and he had developed a pattern of responding to change by engaging in extreme behaviors which include refusing food and fluids and repeatedly attempting to leave the institution. Both Drs. Simcox and Shine concluded that Mr. Anderson is suffering from a mental disease or defect - a psychotic disorder not otherwise specified. Dr. Shine testified that he and other treating doctors could not provide a more specific diagnosis because Mr. Anderson refused to be evaluated.

**B.     In Need of Custody for Care or Treatment.**

A court may conclude that treatment is needed where a prisoner whose untreated mental illness would pose a danger to himself or others if placed in the general prison population. *United States v. Horne*, 955 F.Supp. 1141, 1149 (D. Minn. 1997).

Mr. Anderson is in need of custody for care or treatment because he poses a danger to himself in the general prison population. Mr. Anderson has a pattern of engaging in extreme behavior that is harmful to himself. His initial transfer to FMC resulted from his failure to eat 12 out of 13 consecutive meals at FCI - Terminal Island in December of 2007. He was subsequently hospitalized and given anti-psychotic medication. After receiving medication, he began to eat more consistently, but his behavior continued to be troubling to staff members after he returned to Terminal Island and he was therefore transferred to FMC-Rochester in January of 2008. When he

15

arrived at FMC-Rochester on January 18, 2008, he weighed 137 pounds, having lost 33 pounds since July of 2007. In March 2008 while at FMC-Rochester, he was emergently medicated again for refusing to accept food and fluids. Dr. Simcox testified that after Mr. Anderson was administered medication, he began eating and his level of paranoia diminished.

Mr. Anderson was emergently medicated again in October of 2008 after failing to accept meals and for repeatedly demanding to leave the institution. Gradually, after receiving this medication, he began accepting meals on a regular basis and cooperating with clinical staff.

When Mr. Anderson received emergency medication in the end of March 2009, blood tests indicated that he was in the early stages of dehydration and could have faced serious health risks if he had not been involuntarily administered nutrition and fluids.

Dr. Simcox described Mr. Anderson's symptoms as waxing and waning. He testified that it was necessary, not merely beneficial, that Mr. Anderson be in a facility where he could receive emergency medication and be closely monitored. Dr. Shine also testified that such treatment was not merely beneficial but was potentially life-saving as evidenced by Mr. Anderson's lab tests from March 2009 indicating he was in the early stages of dehydration.

Finally, the Court concludes that the FMC-Rochester is a suitable facility for treatment. Both Drs. Shine and Simcox testified that Mr. Anderson could receive proper care there and Mr. Anderson presented no evidence to the contrary.

**III. RECOMMENDATION**

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Government's Petition [#1] be **GRANTED**.

DATED: May 5, 2009                                          *s/ Franklin L. Noel*
                                                            FRANKLIN L. NOEL
                                                            United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 22, 2009**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 22, 2009,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.